**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT SUTHERBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 1:25-cv-01127-STA-jay** |
| | ) | |
| **JAMES SUKACH, Individual Capacity** | ) | |
| **and Official Capacity as Chief of Police** | ) | |
| **for Big Sandy Police Department,** | ) | |
| **MICHAEL STRADER, Individual** | ) | **JURY TRIAL DEMAND** |
| **Capacity, and** | ) | |
| **JOHN BRYANT ALLEN, Individual** | ) | |
| **Capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**ORDER GRANTING DEFENDANT JOHN BRYANT ALLEN'S MOTION TO DISMISS**

---

Before the Court is Defendant John Bryant Allen's Motion to Dismiss Amended Complaint (ECF No. 37). Allen seeks the dismissal of the Amended Complaint's § 1983 claims against him for malicious prosecution and fabrication of evidence. Plaintiff Robert Sutherby has responded in opposition, and Defendant has filed a reply brief. For the reasons set forth below, the Motion is **GRANTED**.

## BACKGROUND

Plaintiff Robert Sutherby filed his initial Complaint (ECF No. 1) alleging claims for the violation of his civil rights pursuant to 42 U.S.C. § 1983 on May 29, 2025. When Defendant John Bryant Allen ("Agent Allen") filed a Motion to Dismiss (ECF No. 25) the initial Complaint, Plaintiff filed his Amended Complaint (ECF No. 35). Defendant Allen's Motion to Dismiss the Amended Complaint followed.

**I. Factual Background**

1

The Amended Complaint runs over 122 pages and consists of 366 separately numbered paragraphs. For purposes of deciding the Motion to Dismiss, the Court accepts the following well pleaded allegations of the Amended Complaint as true. The Court focuses, however, on the allegations pertaining to the civil rights violations allegedly committed by Agent Allen.

Plaintiff is an ordained minister and provides housing for the homeless in Big Sandy, Tennessee. Compl. ¶ 10. Plaintiff and his wife own a former church property located on the Big Sandy town square. *Id.* ¶¶ 10, 12. They live on the property and use another part of the building as housing for their ministry. *Id.* ¶¶ 14, 16. The housing consists of two second-floor apartments with an adjoining common room. *Id.* ¶ 16.[1] The common room was accessed by two different staircases, one on the interior of the building and the other on the exterior of the building. *Id.*

In March 2023, Teresa Jordan moved into one of the apartments. *Id.* ¶ 33. Jordan had completed a drug and alcohol rehabilitation program at another facility and was working as a cook at the Christian Community Outreach Center ("CCOC"), a church just across the street from Plaintiff's residence and the housing ministry he ran. *Id.* ¶ 34. Upon Jordan completing her rehabilitation program, the CCOC arranged for Jordan to move into one of the apartments provided by Plaintiff's housing ministry. *Id.* Jordan signed a Transitional Housing Agreement, though the Amended Complaint does not indicate whether the agreement was with Plaintiff or his housing ministry. *Id.* ¶ 35. The agreement prohibited Jordan from having drugs or alcohol on the premises and required her to keep her room clean and in good repair. *Id.* The agreement also gave Plaintiff and his wife the right to enter the premises and inspect the room "at all reasonable times." *Id.*

---

[1] Plaintiff has included many allegations about his effort to run for public office and how he was generally received in the community, all apparently to show that he did not have a positive relationship with local authorities. The Court notes these allegations for the record but does not recite them here for the sake of brevity.

Jordan's apartment door had a chain lock with a deadbolt to secure the unit. *Id.* ¶ 36. After living there for about three months, Jordan installed her own hasp, or metal hinge, on the outside of her apartment door and secured the door with a padlock. *Id.* ¶ 38. Plaintiff's wife removed the hasp and the padlock, because in her view the Transitional Housing Agreement did not allow Jordan to change the lock or block access to the apartment. *Id.* ¶ 39. Plaintiff's wife removed the hasp and lock and entered the apartment in late June 2023 while Jordan was out of town. *Id.* ¶ 40. Inside the apartment Plaintiff's wife discovered empty beer cans and beer boxes and a general state of disarray. The Amended Complaint includes photographs depicting the empty beer cans and other household garbage bagged up in the apartment. Plaintiff's wife confronted Jordan about what she had found in the apartment when Jordan returned from her trip on July 1, 2023. *Id.* ¶ 41. Plaintiff's wife informed Jordan that there would be a meeting on July 3, 2025, to determine whether Plaintiff could continue to live in the housing. *Id.*

The night before the meeting on July 2 at 10:56 p.m., Jordan called 911 from her apartment. *Id.* ¶ 44. Plaintiff alleges that Jordan was intoxicated at the time. *Id.* ¶ 45. Jordan reported that a man had come up the exterior stairs to the apartment and she "ran him out." *Id.* ¶ 49. Defendants James Sukach ("Chief Sukach") and Michael Strader of the Big Sandy Police Department were dispatched to respond to Jordan's 911 call. *Id.* ¶¶ 51-54. [2] Chief Sukach and Strader made contact with Jordan at her apartment and conducted an interview. *Id.* ¶ 58. Chief Sukach subsequently completed an incident report in which he summarized the interview. *Id.*

Jordan provided a physical description of the man as having a goatee or facial hair. *Id.* She denied knowing the suspect's name but did identify him as a person who would order food at

---

[2] The Amended Complaint alleges that Defendant Strader was not an actual member of the Big Sandy Police Department but may have been a "reserve officer."

the CCOC food kitchen where she worked and who drove a silver car. *Id*. Jordan claimed the man had entered her room and asked her if she had had sex with a male friend with whom she had recently traveled out of town. *Id*. She also alleged the unidentified man grabbed her arm. *Id*. But once Jordan reached for a kitchen knife and picked up her cell phone to call 911, the man left. *Id*.

Jordan went on to provide officers with information about Plaintiff and his wife. *Id*. According to Jordan, Plaintiff and his wife did not permit her to lock her door and had entered her apartment and searched her room at times when she was not at home. *Id*. Jordan claimed that half of her panties were missing. *Id*. Jordan also stated that the man who had confronted her and grabbed her arm was a friend of Plaintiff's and that if she gave the man's name to police, Plaintiff would evict her. *Id*.

Chief Sukach made a call to dispatch at 12:11 a.m. and relayed information to the dispatcher, including a request for deputies to be on the lookout for a silver car in the area. *Id*. ¶ 61. Big Sandy City Hall, which is located near Plaintiff's property, has a surveillance camera that captured footage of the property at the time of the police response. *Id*. ¶ 68. Chief Sukach and Strader are seen on the footage returning to the patrol vehicle and driving around the church property before finally leaving the premises at 12:30 a.m. *Id*. ¶¶ 69-72.

Within one minute of the police leaving the property, Jordan placed a second call to 911. *Id*. ¶ 75. The Amended Complaint characterizes Jordan's demeanor on the second call as "highly intoxicated" and hysterical. *Id*. ¶¶ 78-79. Although the particulars of what Jordan said to the 911 dispatcher are not entirely clear, the implication is that Jordan told the dispatcher her attacker had returned to her apartment. The surveillance video from Big Sandy City Hall, however, did not show anyone on or near the exterior stairs leading up to Jordan's apartment. *Id*. ¶ 76. Chief Sukach and Strader were immediately dispatched back to the apartment. *Id*. ¶¶ 83-84.

What happened next is not clearly from the Amended Complaint.  According to Chief Sukach's incident report, he and Strader initially made contact with Jordan.  Then, Plaintiff's wife came outside and asked what was going on.  Chief Sukach stated in his report, that he told Plaintiff's wife Jordan had been sexually assaulted in her room and the assailant might still be in the building.  *Id.* ¶ 89.  Chief Sukach's report and Strader's notes state that Plaintiff had also come to the door and then immediately went back inside his home after Chief Sukach mentioned the assault.  *Id.* ¶¶ 86, 89.  Strader's notes stated that Jordan told him Plaintiff had attacked her.  *Id.* ¶ 86.

The Amended Complaint denies this version of events.  Plaintiff alleges that Chief Sukach failed to have his bodycam on to record the episode, even though police department policy required it.  More than that, Plaintiff alleges that Strader fabricated Jordan's accusation identifying Plaintiff as her attacker.  *Id.* ¶ 91. Plaintiff made an audio recording of Chief Sukach's initial conversation with Plaintiff and his wife.  According to a transcript of the recording reproduced in the Amended Complaint, Chief Sukach initially informed Plaintiff and his wife about an attack on Jordan but told them the attacker was a man with a goatee driving a silver car.  *Id.* ¶¶ 92, 93.  After Chief Sukach spoke to Strader, however, both Defendants told Plaintiff's wife Jordan had identified Plaintiff as her attacker.  *Id.*  Plaintiff refused to speak with Defendants.  *Id.*  The Amended Complaint does not allege when Plaintiff went back inside his home; however, Plaintiff does allege that Defendants directed his wife to go inside and bring him back out.  *Id.*  When Plaintiff's wife refused to try to persuade Plaintiff to come out and attempted to go back inside the house herself, Chief Sukach placed her in handcuffs and put her inside his patrol car.  *Id.*

Chief Sukach and Strader proceeded to knock on Plaintiff's door and ordered him to come outside.  *Id.*  When Plaintiff refused to come out of his residence to speak with the police, Chief

Sukach and Strader contemplated entering the residence by force before deciding not to do so. *Id.* ¶¶ 101–103. Chief Sukach released Plaintiff's wife from custody and left the premises with Jordan. *Id.*

Chief Sukach took Jordan to the police station to interview her and obtain a written statement. *Id.* ¶ 104. Chief Sukach recorded the interview with his body cam and also completed an incident report. According to Chief Sukach's incident report, Jordan told him Plaintiff had "raped her with his fingers." *Id.* ¶ 108. Jordan also provided a handwritten statement, a picture of which is incorporated into the Amended Complaint. *Id.* ¶ 110. Although the handwriting in the statement is not entirely legible, Chief Sukach had Jordan read the statement aloud during the recorded interview.

Jordan read from her statement that a man had been coming into her room for weeks and that she felt like she was drugged. Jordan's statement did not name Plaintiff as her attacker. *Id.* ¶ 117. Jordan also told Chief Sukach she never saw her attacker's face but described the person as a man with a "sweet" or clean smell. The Amended Complaint alleges that Chief Sukach and Strader proceeded to suggest to Jordan that her attacker was Plaintiff, first by showing her Plaintiff's driver's license picture and then questioning her about what she knew or had heard about Plaintiff and his wife.

Police arranged for Jordan to check in to a hotel room where Chief Sukach conducted a second interview the following day during the afternoon of July 3. *Id.* ¶¶ 129, 131. Chief Sukach briefly summarized the interview in his incident report and also made a recording of the interview with his body cam. *Id.* ¶ 129. Jordan answered Chief Sukach's leading questions about the first 911 call she had made the night before and told him Plaintiff was the man who questioned her about having sex with a male friend on her recent trip. *Id.* ¶¶ 134-35. But Jordan also told Chief

6

Sukach she could not be sure Plaintiff was the man who came back to her room and raped her. *Id.* ¶ 136.  Jordan admitted to Chief Sukach that she had been drinking prior to making the 911 calls on the night before. *Id.* ¶ 139.

The Amended Complaint alleges that Chief Sukach contacted Agent Allen three days after Jordan was interviewed about the assault.  *Id.* ¶ 140; *but see id.* ¶ 269 (alleging that Agent Allen's report stated that the district attorney had requested TBI assistance on the case).  Agent Allen interviewed Jordan on July 11, 2023.  *Id.* ¶ 141.  Agent Allen made an audio recording of the interview, and Chief Sukach, who was also in attendance, made a video recording.  *Id.* ¶ 142.  According to Plaintiff, when Chief Sukach began recording the interview, Agent Allen is heard remarking to Jordan that "guilty people don't need lawyers" and that Plaintiff was "not from here" and "this is not what Big Sandy is about." *Id.* ¶¶ 144–45.

Agent Allen then engaged in a series of leading questions during the interview, all in an effort to get Jordan to once more identify Plaintiff as her attacker and corroborate the stories fabricated by Chief Sukach and Strader.  *Id.* ¶¶ 151-52.  Plaintiff also alleges that Agent Allen failed to follow up on certain lines of questioning, for example, when Jordan admitted she had been drinking or when the surveillance video from Big Sandy City Hall cast doubt on other parts of her story.  *Id.* ¶¶ 155-59.

Near the conclusion of the interview, Agent Allen asked Jordan if she could identify her attacker from a photo lineup.  *Id.* ¶ 159.  Jordan responded that she did not see his face.  *Id.*  When Agent Allen asked Jordan about picking out of a photo lineup the man who had grabbed her arm and about whom Jordan had made her initial 911 call, Jordan agreed to do it.  *Id.* ¶ 160.  Chief Sukach then presented Jordan with a packet of photos, and as she flipped through them, she picked out Plaintiff as the man who had grabbed her arm and the person she had called 911 about the first

time on July 2. *Id.* ¶ 164. But when Chief Sukach completed an incident report about the photo identification, Chief Sukach reported that Jordan had picked Plaintiff out of the photo lineup "as the man who assaulted and raped her." *Id.* ¶ 165.

The Amended Complaint faults Agent Allen's report about the interview and his subsequent investigation for a number of omissions. The report did not reference any of the video surveillance evidence showing the exterior of Jordan's apartment on the night of her assault. *Id.* ¶ 178. The report never mentions Jordan's original identification of the man who grabbed her arm as a person she knew from the CCOC food kitchen. *Id.* ¶ 179. And although the report includes details about an interview Agent Allen conducted with another former tenant of Plaintiff's shelter ministry, Diana Richie Romero, Agent Allen omitted from the report Romero's statement that she never had any issues with Plaintiff during her time living in the apartment. *Id.* ¶ 181.

Plaintiff also alleges that Allen contacted the Leoni Township Police in Michigan where Plaintiff had lived before moving to Tennessee. *Id.* ¶ 183. Agent Allen spoke with a sergeant in the department and recorded the interview. *Id.* According to the Amended Complaint, Agent Allen stated during the call that he wanted to arrest Plaintiff because in his opinion Plaintiff was a "pedo," or pedophile, and a "rapist." *Id.* Overall, Agent Allen prepared his own report and spoke with prosecutors at least five times about the case before charges were brought against Plaintiff.

A grand jury indicted Plaintiff on October 2, 2023, charging him with two counts of aggravated burglary, one count of assault, and one count of rape. *Id.* ¶ 192. Chief Sukach was the only witness to testify before the grand jury, though the Amended Complaint adds that Agent Allen's report was "relied upon and materially assisted in setting the prosecution in motion." *Id.* ¶ 194. Even though Plaintiff faced a maximum sentence of 25 years in prison, *id.* ¶ 193, the prosecution did not believe they had a strong case. The Assistant District Attorney Anthony Clark

stated during a recorded phone call (apparently with criminal defense counsel for Plaintiff though the Amended Complaint does not spell this out) that the Big Sandy Police Department was "out of their element" in a case of this sort.  *Id.* ¶ 195.  ADA Clark also stated on the call that he did not "disagree" that Agent Allen had provided little help in clarifying what had actually happened to Jordan.  *Id.*

The Amended Complaint alleges that recognizing the weakness of the state's case against Plaintiff, ADA Clark made two plea bargain offers to the defense.  The second and final offer provided for the dismissal *nolle prosequi* of the assault and rape charges and a guilty plea to the two counts of simple burglary, each carrying two-year sentences suspended to supervised state probation with the possibility of diversion.  *Id.* ¶ 200. Criminal defense counsel for Plaintiff responded to Clark by email on May 17, 2024, to reject the offer.  *Id.* ¶ 202.  As part of his explanation for the rejection of the offer, counsel stated that Plaintiff maintained his complete innocence and had spoken with four witnesses with relevant information about the case.  *Id.* ¶ 202.  The email identified the witnesses as Benton County Mayor Mark Ward, Bill Emerich, Debbie Johnson, and Andrew Willhite. *Id.*  The witnesses had relevant information supporting Plaintiff's theory that Jordan had fabricated the entire story just to avoid the July 3 meeting with Plaintiff and his wife to discuss a possible eviction.  *Id.*

The Amended Complaint alleges that a few days later, Agent Allen approached each of the four individuals named in defense counsel's email to ADA Clark.  *Id.* ¶ 204.  Plaintiff alleges that Agent Allen attempted to intimidate the witnesses and exaggerated what criminal defense counsel had stated to the district attorney about the significance of their information.  *Id.*  For example, Agent Allen recorded his conversation with Mayor Ward, including Mayor Ward's remark to

Agent Allen that he did not believe he had any relevant information. *Id*.[3]  In context, Mayor Ward explained to Agent Allen that he thought when Jordan moved away, there would be no case against Plaintiff and that would be the end of the matter. *Id*. ¶ 208.

Agent Allen also spoke to Bill Emerich, the president of the CCOC, and Jordan's former employer as a cook at the CCOC's food kitchen. *Id*. ¶ 213.  In a recorded interview with Agent Allen, Emerich voiced his suspicions that Jordan had begun to drink again and that after she moved out of Plaintiff's shelter, she had stayed either at Emerich's house or the house of someone closely related to him or his ministry at the CCOC.  According to Emerich, Jordan had left behind empty liquor bottles under her bed. *Id*.  But when Agent Allen wrote up his report to document the interview, he simply summarized the Emerich conversation and concluded that Emerich did not have any relevant information. *Id*. ¶ 214.

Agent Allen's incident report to document his interview with Debbie Johnson followed a similar pattern.  Agent Allen reported that Johnson told him that she did not think Jordan had any motive to lie. *Id*. ¶ 218.  But Agent Allen's recording of the interview with Johnson shows Agent Allen pressed Johnson to reach that conclusion. *Id*. ¶¶ 216, 217.  The Amended Complaint also excerpts part of Agent Allen's interview with Debbie Johnson.  Plaintiff alleges the excerpt shows Agent Allen argued with Johnson about Jordan's reasons for wanting to leave town after the episode and the impact a sexual assault could have on a victim.  Plaintiff alleges that as a result of Agent Allen's incomplete reports, the district attorney rejected Plaintiff's offer to drop the charges. *Id*. ¶ 221.

---

[3] Plaintiff alleges that Agent Allen's interview amounted to intimidation and witness tampering.  That allegation, though, is a legal conclusion, which the Court need not accept as true to decide Agent Allen's Motion to Dismiss.

Plaintiff's trial began July 29, 2024.  *Id.*  Although ADA Clark told the jury in his opening statement that he would call Agent Allen as a witness at trial, Agent Allen did not testify.  *Id.* ¶ 223.  Agent Allen did sit at counsel's table throughout the trial as the state's case representative. *Id.*  During the trial, the jury heard from Jordan and Chief Sukach.  Jordan failed to recall certain facts about the night of her alleged assault and became emotional on cross-examination.  After hearing Jordan's testimony and her failure to remember facts about the night of the alleged assault, the trial judge expressed concern to the parties (and out of the jury's presence) that "the State's primary witness has obviously lied under oath." *Id.* ¶ 238.  The jury took approximately 35 minutes to deliberate before it returned a not guilty verdict as to all four counts against Plaintiff.  *Id.* ¶ 245.

The Amended Complaint concludes with a review of evidence that would have called Jordan's original complaints into question, evidence Defendants must have reviewed or failed to review before reaching their conclusion that Plaintiff had committed the crimes charged.  From these premises, Plaintiff would hold Agent Allen liable for malicious prosecution and fabrication of evidence in violation of Plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983.  On the malicious prosecution claim, Plaintiff alleges that Agent Allen violated his rights by submitting a 14-page investigative report, which influenced the decision to prosecute Plaintiff, and that Agent Allen's subsequent reports persuaded the state to prosecute and go to trial.  *Id.* ¶ 323.  On the fabrication of evidence claim, Plaintiff alleges that Agent Allen included false statements (presumably in his reports) about

- a person entering Jordan's apartment when available security footage would have dispelled the claim;

- Jordan being the victim of a sexual assault when no medical examination was performed to confirm the claim;

- leaving out a previous tenant's exculpatory statement that she never had a problem
  with Plaintiff while living there;

- Jordan had during her interview with Agent Allen identified Plaintiff as the person
  has raped her;

- Jordan stating on the second 911 call that Plaintiff had attacked her;

- Omitting Jordan's initial description of the man she had seen at the CCOC;

- Jordan's identification of Plaintiff from the photo lineup; and

- Jordan had locked the door to her apartment after her first 911 call.

## STANDARD OF REVIEW

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the Court must treat all the well–pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party. *Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (citing *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019)).  However, legal conclusions or unwarranted factual inferences need not be accepted as true. *Fisher v. Perron*, 30 F.4th 289, 294 (6th Cir. 2022) (citing *Iqbal*, 556 U.S. at 678).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "(1) a short and plain jurisdictional statement, (2) a short and plain statement of the claim, and (3) an explanation of the relief sought." Fed. R. Civ. P. 8(a).  "That's it. By listing these elements, Rule 8 implicitly 'excludes other requirements that must be satisfied for a complaint to state a claim for relief.'" *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10, at 107 (2012) (other

citation omitted). Rule 8's notice pleading standard does not require "detailed factual allegations." *Iqbal*, 556 U.S. at 681.

But Rule 8 does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* "Although the rule encourages brevity," a plaintiff must nevertheless "say enough to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing *Dura Pharm. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)). "Rule 8 does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Iqbal*, 556 U.S. at 687. In order to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This means, a complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 877 (6th Cir. 2021) (citing *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) ("A complaint must contain enough 'factual matter' to raise a 'plausible' inference of wrongdoing.") (quotation omitted).

**<u>ANALYSIS</u>**

13

**I. Motion to Dismiss the Initial Complaint**

As a threshold matter, Plaintiff filed his Amended Complaint in response to Agent Allen's Motion to Dismiss the initial Complaint. "Once an amended pleading is interposed, the original pleading no longer performs any function in the case." *Crawford v. Tilley*, 15 F.4th 752, 759 (6th Cir. 2021) (quoting 6 Arthur R. Miller, Mary Kay Kane & A. Benjamin Spencer, *Federal Practice & Procedure* § 1476 (3d ed. 2021)); *see also Heyward v. Cleveland Clinic Found.*, 759 F.3d 601, 617 (6th Cir. 2014) (citation omitted). Generally speaking, "filing an amended complaint moots pending motions to dismiss." *Id.* (collecting cases). Courts in this Circuit routinely deny motions to dismiss a pleading as moot after the pleading party subsequently amends its pleading. *E.g., Pinks v. Lowe's Home Centers, Inc.*, 83 F. App'x 90 (6th Cir. 2003); *Am. Nat'l Prop. & Cas. Co. v. Stutte*, 298 F.R.D. 376, 380 (E.D. Tenn. 2014); *Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 948 (M.D. Tenn. 2012); *Ellis v. Kaye-Kibbey*, 581 F. Supp. 2d 861 (W.D. Mich. 2008).

In light of the fact that Plaintiff has filed an amended pleading, the original Complaint is, strictly speaking, a nullity. Therefore, Agent Allen's Motion to Dismiss the initial Complaint is **DENIED** as moot.

**II. Claims for the Violation of Plaintiff's Constitutional Rights under 42 U.S.C. § 1983**

Plaintiff's Amended Complaint seeks to hold Agent Allen liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983. Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. "Section 1983 is not the source of any substantive right," *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001), but creates a "species of tort liability" for the violation of rights guaranteed in the Constitution itself. *Manuel v. City of Joliet,*

*Ill.*, 580 U.S. 357, 362 (2017) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)). In order to make out a § 1983 claim, a plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

Under § 1983, the Court's "threshold inquiry" is "to identify the specific constitutional right" at issue and then apply the relevant elements and rules of an action to vindicate the right. *Manuel*, 580 U.S. at 370 (quoting *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (plurality opinion)). Plaintiff alleges constitutional claims based on malicious prosecution and the fabrication of evidence. The constitutional rights at stake here are guaranteed by the Fourth Amendment, though Plaintiff also cites the Fourteenth Amendment.

The Fourth Amendment of the United States Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. Amend. IV. Malicious prosecution implicates the Fourth Amendment's protection against unreasonable seizures. "The constitutional violation alleged in [a malicious prosecution] suit is a type of unreasonable seizure—an arrest and detention of a person based on a criminal charge lacking probable cause." *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 562 (2024).

The Fourth Amendment also governs Plaintiff's claim that Agent Allen fabricated evidence against him and that the evidence was presented to the grand jury to obtain the indictment. The Amended Complaint alleges that Plaintiff's fabrication of evidence claim implicates the Fourteenth Amendment. The Court considers that issue in more depth below. Suffice it to say, when a plaintiff "was never convicted of a crime based on the allegedly fabricated evidence but rather was arrested and charged with crimes based on such evidence, his § 1983 fabrication claim

arises under the Fourth Amendment." *Codrington v. Dolak*, 142 F.4th 884, 893 (6th Cir. 2025) (citing *Clark v. Abdallah*, 131 F.4th 432, 447 (6th Cir. 2025)).

The Court now considers whether the Amended Complaint states a plausible claim for either type of relief.

## A. Fourth Amendment - Malicious Prosecution

To succeed on a Fourth Amendment malicious prosecution claim, "a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person." *Chiaverini*, 602 U.S. at 558 (citing *Thompson v. Clark*, 596 U.S. 36, 43, and n.2 (2022)). The United States Court of Appeals for the Sixth Circuit has defined the following elements required to prove a § 1983 malicious prosecution claim: (1) a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff consequently suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceedings resolved in the plaintiff's favor. *Codrington*, 142 F.4th at 895 (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)).

At the pleadings stage, Agent Allen raises two arguments for the dismissal of the malicious prosecution claims against him. First, Agent Allen argues that the Amended Complaint fails to allege how he made, influenced, or participated in the decision to prosecute Plaintiff. Agent Allen reads the Amended Complaint to allege minimal involvement on his part. Next, Agent Allen argues that the Amended Complaint fails to allege the second element of Plaintiff's malicious prosecution claim against him, that probable cause for the charges against Plaintiff was lacking. Because a grand jury returned an indictment against Plaintiff and the Amended Complaint fails to

16

allege enough facts to dislodge the presumption of probable cause, the Court confines its analysis to the probable cause issue.

Generally speaking, the police "need not surmount a high bar to show probable cause for a prosecution." *Howell v. McCormick*, 148 F.4th 834, 853 (6th Cir. 2025) (citation omitted). They need only establish "a probability or substantial chance" that the suspect committed the charged crimes. *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). And where a grand jury returns an indictment, the indictment "creates a presumption that probable cause supported these charges." *Price v. Montgomery Cnty., Ky.*, 72 F.4th 711, 725 (6th Cir. 2023). The Supreme Court has held that in deciding claims for malicious prosecution, courts should examine probable cause "charge by charge." *Chiaverini*, 602 U.S. at 562. Here, a grand jury returned an indictment charging Plaintiff with burglary, assault, and rape. The indictment therefore creates a presumption that there was probable cause to charge Plaintiff with these crimes.

Plaintiff can only hold Agent Allen liable for malicious prosecution if Plaintiff can rebut the indictment's presumption of probable cause. A plaintiff alleging malicious prosecution can rebut the presumption by showing

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017).

The Court holds that the Amended Complaint does not allege any factual material to make these showings. First, the Amended Complaint does not allege facts to show Agent

Allen knowingly or recklessly made false statements in the course of setting the prosecution in

motion. Agent Allen was employed with the Tennessee Bureau of Investigation and was

essentially brought into the case, either at Chief Sukach's request or at the request of the district

attorney, to assist the Big Sandy Police Department with the investigation. By the time Agent

Allen got involved, more than a week had passed since the alleged assault on Jordan. Chief

Sukach, who had responded to both of Jordan's 911 calls and been part of the investigation from

the start, had already interviewed Jordan at her apartment, obtained her written statement at the

police station, and conducted two recorded interviews with her. The Amended Complaint also

alleges Chief Sukach maintained contact with Jordan after she moved out of state and gave her

updates on the case against Plaintiff.

The Amended Complaint alleges Agent Allen played a much less conspicuous role in the

investigation. Agent Allen interviewed Jordan but as part of what was the third interview she gave

to law enforcement. Agent Allen's interview did not actually develop any new information or

lines of investigation, at least as far as the Amended Complaint shows. In fact, Agent Allen

explained to Jordan that law enforcement "normally" would not ask "victims [to] tell their story

over and over and over because it's tough." Am. Compl. ¶ 146. Agent Allen's role, however, was

to ask questions Chief Sukach "didn't think to ask" Jordan in an effort to "make our case better."

*Id*. Despite calling Agent Allen in for his expertise, the ADA later remarked that Agent Allen had

not done much to improve upon the investigation Chief Sukach had already completed. [4]

---

[4] The Amended Complaint actually alleges a number of facts to undercut any inference that
Agent Allen put the prosecution in motion. For example, ADA Clark told Plaintiff's criminal
defense counsel Agent Allen had not provided much help to the local police. The Amended
Complaint also emphasizes that ADA Clark knew the case was a weak one and that in recognition
of the weakness of the case, offered Plaintiff two different bargains to settle the charges. The
second and last plea bargain offered by the state would have resulted in an effective sentence of
probation with the possibility of diversion. If anything, these allegations suggest the prosecution

Consistent with the ADA's appraisal of Agent Allen's role, the Amended Complaint does not allege what additional information Agent Allen developed in his investigation that Chief Sukach had not already obtained in the hours and days immediately after the alleged assault. Agent Allen's principal contribution to the case seems to have been his interviews with witnesses other than Jordan. For example, Agent Allen conducted recorded interviews and provided written summaries of the interviews with a former tenant who had lived in Plaintiff's ministry housing and an officer from the Michigan town where Plaintiff had previously lived. Post-indictment, Agent Allen also interviewed four different witnesses identified by the defense. Beyond these interviews, the Amended Complaint alleges that the district attorney's office consulted Agent Allen at different points during the investigation and before the case was presented to the grand jury. To the extent it has bearing on the question, Agent Allen acted as the state's representative at Plaintiff's criminal trial.

The Amended Complaint bases Plaintiff's claim of malicious prosecution against Agent Allen on two features of Agent Allen's investigation: Jordan's recorded statement to Agent Allen and Agent Allen's omission of possibly exculpatory evidence from his investigative reports. Neither point shows why Plaintiff can overcome the presumption of probable cause and hold Agent Allen liable for malicious prosecution.

To begin with, the Amended Complaint does not allege what false statements Agent Allen included in his report other than information Agent Allen received from Jordan, the alleged victim and a presumed eyewitness to the crimes, during the interview. As "firsthand observations," eyewitness statements are "entitled to a presumption of reliability and veracity," meaning law

---

did not find Agent Allen's conclusions entirely persuasive. Regardless, the question for the Court is whether the Amended Complaint alleges enough facts to show that Agent Allen was put the prosecution in motion.

enforcement officers may reasonably rely on the accounts. *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). In the context of a claim for malicious prosecution, law enforcement is "entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest . . . unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Clark v. Abdallah*, 131 F.4th 432, 453 (6th Cir. 2025) (citing *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)). "Otherwise, any time a suspect provided conflicting stories, an officer would be liable for pursuing one theory in good faith." *Anderson v. Knox Cnty.*, No. 22-5280, 2023 WL 4536078, at *6 (6th Cir. July 13, 2023) (citing *United States v. Burch*, 471 F.2d 1314, 1317 (6th Cir. 1973)).

Simply put, Jordan's testimony established probable cause for each of the charges against Plaintiff. Jordan provided eyewitness testimony about the fact that a man had twice entered her home on July 2 (burglary), grabbed her by the arm (assault), and then sexually assaulted her (rape). Jordan had already identified Plaintiff as her assailant during her interviews with Chief Sukach. During the course of Agent Allen's interview, Jordan identified Plaintiff as the man who came to her apartment and grabbed her arm before she placed the first 911 call on July 2. The only new development to come out of Agent Allen's interview was the improvised photo identification in which Jordan picked Plaintiff out as the person who had grabbed her arm and demanded to know whether Plaintiff had had sexual relations with her male friend during their out-of-town trip together. Although Plaintiff faults the identification testimony as suggestive, the fact remains Jordan had previously identified Plaintiff as her assailant. The photo identification just buttressed her earlier statements that Plaintiff had entered her apartment on the evening of July 2.

Furthermore, Plaintiff alleges that Jordan's statements to Agent Allen were coached or outright false and Agent Allen included the coached and false statements in his report.  Rather than showing that Agent Allen coached Jordan's testimony, the Amended Complaint alleges that Agent Allen was fleshing out Jordan's own version of events, to pursue lines of inquiry Chief Sukach may have overlooked. The Amended Complaint alleges, for example, that Agent Allen coached Jordan to elicit her specific testimony about how she locked the door to her apartment after the first 911 call, presumably to show that only a person with a key could have entered a second time. However, "crafting questions along [a witness's] own storyline" is a "standard interrogation technique" and "not evidence of fabrication or coercion."  *Anderson v. Knox Cnty.*, No. 22-5280, 2023 WL 4536078, at *6 (6th Cir. July 13, 2023) (citing *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)). While Plaintiff plausibly alleges Agent Allen might have harbored his own suspicions of Plaintiff,[5] nothing in the Amended Complaint shows Agent Allen's report contained any coached information from Jordan.  Therefore, Plaintiff has not alleged that Agent Allen knowingly or recklessly included false statements in the report.[6]

---

[5] Agent Allen allegedly made statements during the course of his investigation, implying he had already decided Plaintiff was guilty. Agent Allen remarked to Jordan before he had interviewed her that Plaintiff was not from Big Sandy and was "not what Big Sandy is about."  As part of a later telephone interview with a member of law enforcement in Michigan, Agent Allen said that he viewed Plaintiff as a "pedo" and a "rapist" and wanted to arrest him.  The Amended Complaint also alleges that Agent Allen told another witness he interviewed, Debbie Johnson, that other people were not in a position to judge the emotional impact a sexual assault could have on a victim like Jordan.  These allegations imply that Agent Allen may have predetermined Plaintiff's guilt even before his investigation was complete.

[6] The Amended Complaint alleges that Chief Sukach erroneously stated in his report that during the interview with Agent Allen, Jordan had identified Plaintiff's photo as the person who sexually assaulted her, not the person who had grabbed her by the arm.  But the Amended Complaint alleges that that false statement was in Chief Sukach's report, not Agent Allen's.

Likewise, Plaintiff cannot hold Agent Allen liable for omitting exculpatory information. The Amended Complaint describes a series of omissions from Agent Allen's reports: the failure to mention the video surveillance showing the exterior of Jordan's apartment on the night of her assault; the failure to mention Jordan's original identification of the man who grabbed her arm as a person she knew from the CCOC food kitchen; the omission of exculpatory evidence given by a former tenant; and the omission of a more complete summary of witness interviews he conducted with community members in Big Sandy. Even viewed in a light most favorable to Plaintiff, much of the evidence cited does not appear to be material to Plaintiff's innocence or guilt. In fact, Agent Allen's interviews with community members occurred *after* the grand jury had already indicted Plaintiff. The fact also remains that Agent Allen made recordings of his interviews and included the full recordings with his reports.

Still, the Amended Complaint plausibly alleges the written reports omitted certain facts or failed to draw all inferences in favor of Plaintiff's innocence. But that is not the stuff of a malicious prosecution. Omitting supposed exculpatory evidence is not the same as "affirmative false statements." *Lester v. Roberts*, 986 F.3d 599, 608 (6th Cir. 2021) (citing *King*, 852 F.3d at 587). The failure "to disclose potentially exculpatory evidence differs from affirmatively falsifying evidence." *Id.* (collecting cases). And even if the omission of context-framing information gave a misleading impression, the omissions are not outright falsehoods and fail to show that an officer "knowingly or recklessly made false statements, falsified evidence, or fabricated evidence to set a prosecution in motion." *Price v. Montgomery Cnty., Kentucky*, 72 F.4th 711, 725 (6th Cir. 2023). At the end of the day, police had probable cause to charge Plaintiff with burglary, assault, and rape because Jordan had already provided eyewitness testimony about the events and named Plaintiff as her attacker. "Once probable cause was established, . . . , [law enforcement is] under no duty

to investigate further or to look for additional evidence which may exculpate the accused."
*Franklin v. Miami Univ.*, 214 F. App'x 509, 512 (6th Cir. 2007).

The allegations of the Amended Complaint simply fail to show that Agent Allen himself knowingly or recklessly included any false statements in his reporting. Therefore, the Court concludes that Plaintiff has not rebutted the presumption of probable cause and as such has failed to state a claim for malicious prosecution against Agent Allen. Agent Allen's Motion to Dismiss is **GRANTED** as to this claim.

## B. Fourteenth and Fourth Amendment – Fabricated Evidence

Plaintiff finally alleges a fabrication-of-evidence claim against Agent Allen, a claim implicating both the Fourteenth Amendment and the Fourth Amendment. Because the Amended Complaint labels the claim as a Fourteenth Amendment violation, the Court begins its analysis there.

The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving a person of liberty without due process of law. U.S. Const. amend XIV, § 1. "The due-process right is infringed when the prosecution presents evidence that is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Clark*, 131 F.4th at 447 (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 815 (6th Cir. 2019) (cleaned up). The "core" of the Fourteenth Amendment due process right is "not the deprivation of liberty but the right to a fair trial." *Id*.

Here, the Amended Complaint fails to allege how any evidence supposedly fabricated by Agent Allen affected Plaintiff's rights at trial. Plaintiff alleges a great deal of detail about Chief Sukach's trial testimony and even the testimony of Jordan herself. However, Plaintiff does not allege any facts to show that information gathered as part of Agent Allen's investigation was

23

introduced at trial or could have influenced the jury's verdict in any way. On the contrary, the Amended Complaint states that Agent Allen was never even called as a witness even though the ADA had told the jury in his opening statement Agent Allen would testify. Without these basic pleading elements, the Court holds that Plaintiff has not shown how Agent Allen's allegedly fabricated evidence affected his right to a fair trial and has therefore failed to state a plausible fabrication-of-the-evidence claim under the Fourteenth Amendment.

Plaintiff's fabrication claim against Agent Allen fares no better when viewed as a possible Fourth Amendment violation. As the Court has already noted, the fabrication of evidence can also implicate the Fourth Amendment. In order to state a Fourth Amendment fabrication of evidence claim, Plaintiff must allege that Agent Allen "fabricated evidence presented to a grand jury or to a judge determining probable cause." *Dolak*, 142 F.4th at 893. The Sixth Circuit has observed that there is not a brightline differentiating a Fourth Amendment claim based on the fabrication of evidence from a Fourth Amendment malicious prosecution claim. *Clark*, 131 F.4th at 447 ("When individuals present claims that they were unlawfully detained based on fabricated evidence, we tend to consider them under the rubric of malicious prosecution."); *Tanner v. Walters*, 98 F.4th 726, 733–34 (6th Cir. 2024) ("Claims stemming from a plaintiff's seizure and continued detention based on purportedly false or fabricated evidence presented by law enforcement fall under the broad umbrella of malicious prosecution and are rooted in the protections afforded by the Fourth Amendment.").

Disregarding the Fourteenth Amendment label attached to the fabrication of evidence claim in the Amended Complaint, the Court holds that Plaintiff fails to state a Fourth Amendment fabrication claim against Agent Allen. Even viewing the pleadings in a light most favorable to Plaintiff, the Amended Complaint largely alleges that the same errors and omissions forming the

basis of Plaintiff's malicious prosecution claim against Agent Allen also forms the basis for his fabrication claim: that Agent Allen "fabricated" information from Jordan's recorded interview, "fabricated" Jordan's identification of Plaintiff from the improvised photo lineup, and "fabricated" his reports describing interviews with other witnesses. But the Amended Complaint uses "fabrication" as a stand in for "factually false or materially incomplete statements." Plaintiff does not deny that Jordan actually identified Plaintiff from the photo lineup, however flawed it may have been, or that Agent Allen actually conducted the interviews he described in his investigative reports. By "fabrication," Plaintiff seems to mean that Agent Allen included wrong or incomplete information in his reports. But that is not "fabricration." *Anderson*, 2023 WL 4536078, at *5 ("[F]abrication means more than just wrong information—it means evidence offered knowingly or in bad faith.") (collecting cases).

Furthermore, Plaintiff fails to allege that any of the supposedly "fabricated" information was presented to the grand jury, much less that the prosecution introduced any false information through Agent Allen. The Amended Complaint actually alleges that "[a]ccording to the Indictment, Defendant Sukach was the only witness for the State before the Grand Jury but the reports of Defendant Strader and Defendant Allen were relied upon and materially assisted in setting *the prosecution in motion*." Am. Compl. ¶ 194 (emphasis added). Other than this passing reference to Agent Allen's reports, Plaintiff alleges no facts to show that any of the allegedly "fabricated" information was even presented to the grand jury. This is not enough to allege a Fourth Amendment violation based on fabricated evidence. *Smith v. Silvernail*, No. 24-3187, 2025 WL 80370, at *6 (6th Cir. Jan. 13, 2025) (holding that plaintiff did not rebut presumption of probable cause without "identify[ing] any false evidence or testimony that was presented to the grand jury")).

**C. Qualified Immunity**

Agent Allen argues that even if his role in the investigation could be said to have violated Plaintiff's constitutional rights against malicious prosecution and the fabrication of evidence, the Court should grant him qualified immunity. "Qualified immunity protects government officials unless they (1) violated a constitutional right that was (2) clearly established." *DeVooght v. City of Warren, Mich.*, --- F.4th ---, 2025 WL 3089561, at *3 (6th Cir. Nov. 5, 2025) (quoting *VanPelt v. City of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023)). "A defendant asserting qualified immunity at the motion-to-dismiss stage may argue both that the facts set out in the complaint do not plausibly allege a violation of the plaintiff's statutory or constitutional right—that the complaint fails to state a claim—and that, even if so, the right was not clearly established at the time of the challenged conduct." *Mitchell v. City of Benton Harbor, Mich.*, 137 F.4th 420, 429 (6th Cir. 2025).[7]  Because the Amended Complaint does not plausibly allege that Agent Allen violated Plaintiff's constitutional rights, the Court holds that Agent Allen is entitled to qualified immunity.

## CONCLUSION

---

[7] The Sixth Circuit recently commented that "our circuit disfavors granting qualified immunity at the motion-to-dismiss stage." *Romero v. City of Lansing, Mich.*, 159 F.4th 1002, 1008 (6th Cir. 2025) (citing *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015)).  The Court of Appeals explained that in the absence of any "factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent." *Id.* (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)).  Here, the Court cannot say that a pleading of 122 pages and 366 numbered paragraphs, not including supporting exhibits, lacks factual development.  The Sixth Circuit's concern in *Romero* was a dismissal at the pleadings stage based on the district court's conclusion that the constitutional right at stake was not clearly established.  Because the Court holds that the Amended Complaint fails to state a plausible claim against Agent Allen for the violation of Plaintiff's constitutional rights, Agent Allen is entitled to qualified immunity.  The Court finds it unnecessary to decide whether the right at issue was also clearly established, which seemed to be the concern of the Court of Appeals in *Romero*.

The Amended Complaint fails to state a claim against Agent Allen for malicious prosecution or the fabrication of evidence. The Court holds then that the claims are dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and that Agent Allen is entitled to qualified immunity. Therefore, the Motion to Dismiss is **GRANTED**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: December 30, 2025.